JjjSHORTESS, C.J.
At approximately 8:00 p.m. on April 21, 1993, Phyllis H. Clark (plaintiff) was driving a 1986 Toyota Corolla northbound on Louisiana Highway 660 (Coteau Road) toward its intersection with Louisiana Highway 3087 (Prospect Street) in Terrebonne Parish. Her husband, Graylenn L. Clark, and their minor children, Kevin D. Clark and Keith R. Clark, were passengers in the Toyota. At the intersection of Coteau and Prospect, the Toyota was hit broadside by an eastbound 1992 GMC Sierra half-ton pickup truck owned by Gilbert Parker, Jr., and operated by Kirk A. Mitchell. All the occupants of the Toyota were injured, and Graylenn Clark later died as a result of the injuries he sustained in the collision. Mitchell was also injured in the crash.
Plaintiff brought suit individually and on behalf of her minor children against Mitchell, Parker, and Parker’s liability insurer, Louisiana Indemnity Company, as well as the State of Louisiana, through the Department of Transportation and Development (DOTD), and T.L. James & Company, Inc. (James). Mitchell filed a separate suit against DOTD.[1] The cases were consolidated for trial. Plaintiff voluntarily dismissed Parker at the beginning of the bench trial. After trial the court, without written or oral reasons, rendered judgment in the Clark suit against Mitchell, Louisiana Indemnity Company, James, Highland Insurance Company (Highland), and DOTD. In Mitchell’s suit, the trial court rendered judgment against James, Highland, and DOTD. The trial court apportioned fault 20% to Mitchell, 20% to James, and 60% to DOTD. James, Highland, and DOTD appeal.
JUDGMENT AGAINST HIGHLAND INSURANCE COMPANY
Highland contends the trial court erred in casting it in judgment as it was never made a defendant to either plaintiffs or Mitchell’s suit. Our review of the record shows this contention is correct. The judgment against Highland is a nullity and will be vacated.[2]
PARTICLE IN THE COURIER
DOTD contends the trial court erred in admitting into evidence an article in the Houma newspaper, The Courier, regarding this accident and the actions of the Terre-bonne Parish Sheriffs Office in trimming trees near the intersection. DOTD correctly contends that the article is hearsay. The newspaper published the article with a photograph below it. While a photocopy of this portion of the newspaper was found with the exhibits in the record, the trial court actually admitted only the photograph. In response to defense counsel’s objections, the trial court commented, “This is a bench trial, you know.” It is safe to assume the trial court did not consider the article in making its decision. This assignment of error has no merit.
LIABILITY OF JAMES AND DOTD

Theories of the parties

Plaintiff and Mitchell agree that Mitchell is at fault to some degree for running the red light. They contend, however, that James and DOTD share the fault because trees along the right of way obscured the *1239 traffic signal and warning signs, and construction-warning lights placed beyond the intersection by James distracted Mitchell to the extent he failed to see the red light. James and DOTD, however, contend the sole cause of the accident was Mitchell’s inattention and failure to stop for the red light. The trial court gave no written or oral reasons, but it must have agreed with plaintiff and Mitchell’s contentions as it apportioned 80% of the fault to James and DOTD.
The remaining assignments of error concern the trial court’s finding of liability and apportionment of fault to James and DOTD. We have carefully reviewed the testimony and other evidence regarding fault and summarize it below.

Undisputed evidence regarding the scene

Based on the diagrams, photographs, and testimony, we describe the scene as follows. Prospect Street is a four-lane divided highway that runs generally east and west. Its posted speed limit is 50 miles per hour. Coteau Road is a two-lane highway that runs generally north and south. Its posted speed limit is 45 miles per hour. About a half mile west of the intersection of Prospect and Coteau, Prospect crosses the Intracoastal Waterway. The bridge over the waterway is elevated. From the crest of the bridge, an eastbound motorist would travel downhill for approximately 1,400 feet l4and then would travel approximately 1,200 feet more on a straightaway to Prospect’s intersection with Coteau.
This intersection is controlled by a traffic signal that cycles green to yellow to red. The signal was installed approximately a month before the accident. Before that, it was controlled by a yellow blinking light on Prospect and a red blinking light on Coteau.
Several signs warned eastbound motorists of the upcoming intersection and traffic signal. DOTD used a complementary sign system, i.e., identical signs on each side of the roadway. Two intersection-ahead signs (yellow diamond-shaped signs with black crosses in the centers) were located 893 feet from the stop line at the intersection.[3] One was on the right shoulder, the other was in the median on the left. Two signal-ahead signs (yellow diamond-shaped signs with pictures of traffic lights in the centers) were located 650 feet from the stop line. These signs were also placed on both the right and left.
Five hundred to 600 feet east of the intersection, approaching Prospect’s intersection with Louisiana Highway 316 (Bayou Blue Road), road construction was in progress. The right, eastbound lanes of Prospect were closed, and traffic was detoured across the median into the left lane of Prospect westbound. Orange barrels with lights atop them warned motorists of this detour. According to a work-zone diagram entered into evidence by plaintiff, several signs placed on both the right and left sides of the eastbound lanes of Prospect before the intersection warned of construction ahead.
There was no rain on the night of the accident; the pavement was dry. The area is unlighted. According to Francis H. Wyble, DOTD’s expert in traffic engineering and accident reconstruction, the sun set approximately 30 minutes before the accident. There was a cloudy sky and no moon that night. The intersection was totally dark except for the traffic signal and the construction lights in the distance.

Testimony of the witnesses

Leo Giovanni and his wife were southbound on Coteau. He testified the light turned green at the intersection just as they approached it, so they entered the | ¡^intersection. Then Mrs. Giovanni realized Mitchell was not going to stop for the red light. She yelled at her husband to stop, and he “hit [his] brakes real hard.” They then saw Mitchell’s truck hit the Clark vehicle. He stated the truck veered *1240 slightly to the left, but it never slowed down.
Mitchell’s truck rolled into a small ditch. Giovanni parked his vehicle, got out, and ran to the truck. He told Mitchell he had run the red light, but Mitchell told him he had never seen it. Mitchell did not mention anything about being distracted by construction lights or his vision being obscured by branches.
Bart J. Bergeron was driving the vehicle behind the Clarks. He testified that when the light turned green for Coteau, a truck ahead of the Clarks proceeded into the intersection. The Clark vehicle hesitated for a few seconds, then also entered the intersection. Bergeron saw Mitchell’s truck approaching the intersection and realized it was not slowing down. He was afraid Mitchell would try to swerve around the Clark vehicle and hit him, so he covered his two-year-old son and tried to pull over. The front end of the Clark vehicle had crossed the right lane of Prospect when it was hit by Mitchell’s truck. The truck never slowed down, as if Mitchell never saw the Clark vehicle in front of him.
Plaintiff testified she stopped at the intersection behind a truck with a chrome bumper. Her husband told her to stay back from the truck because her headlights were reflecting off its bumper. When the light turned green and the truck entered the intersection, she waited a few seconds before proceeding. She could not say what happened after that. After entering the intersection, her next memory was of waking up unable to breathe and seeing her husband lying next to her between the seats, covered in blood.
Mitchell testified he was coming down the bridge eastbound in the right lane, staring straight ahead, and “the next thing [he knew], a car was in front of [him].” He stated he saw some lights in the distance and his mind was on those lights, trying to figure out what they were. He testified he never looked to his right or left. He never saw the traffic signal, the signs on either side of the road, the Giovanni vehicle in the southbound lane of Co-teau, or the truck in front of the Clarks that crossed both eastbound lanes of Prospect and turned left.
[¿The next day or the day after that, Mitchell returned to the scene. He wanted to try to determine why he did not see the red light. After driving the route again, he noticed trees along the shoulder had been cut. He concluded that the trees “had to be” the reason. He stated there were still “a couple” left that blocked his view of the traffic signal, but the majority of them had been cut. The trees had been “at the top of the bridge, almost to the bottom of the bridge.” He looked straight ahead as he had done the night of the accident. When asked if he had noticed the signs after the trees were cut, he replied negatively.
Giovanni testified the traffic signal was “kind of a little hard to see” before the bottom of the bridge because of the trees. But after a motorist descended the bridge, the signal was clearly visible. It was blocked only for an instant while on the bridge. According to Giovanni, once a motorist got to the base of the bridge, he should be able to see the signal, which he estimated was about 300 yards away at that point.
Plaintiff testified the trees obscured the view of the traffic signal as one was coming down the bridge. She stated, however, that once a motorist got to the bottom of the bridge, the signal was visible. Plaintiff testified that all the warning signs on the right were blocked by grass and weeds. She had never noticed the warning signs on the left, even though she was familiar with the intersection.
Jerry J. Larpenter, the sheriff of Terre-bonne Parish, testified he traveled Prospect on a regular basis and had driven that route before the trees were cut. He stated that before the trees were cut, at times the light was not visible between the crest of the bridge and the bottom. It was by *1241 his order that a deputy took a crew of inmates to trim the trees following this accident. He noted, however, that once a motorist reached the bottom of the bridge, the traffic fight was visible.
Allen Carpenter, Jr., a state trooper, investigated this accident. He was very familiar with the intersection, going through it five to ten times per week. On the night of the accident, in the course of his investigation, he traveled over the bridge, following Mitchell’s route. He testified he could see the signal from the crest of the bridge. Midway down the bridge there was a point where the signal was obscured for a few seconds, but once a motorist reached the bottom of the bridge, there were no obstructions of view that would have blocked the traffic signal. He stated the signal was obvious in the otherwise dark area.
j7Wyble testified that the Manual for Uniform Traffic Control Devices, a standard -with “the impact of law,” sets the minimum visibility for a traffic signal at 540 feet. If visibility is less than that, an intersection-ahead sign is required. No sign was required at this intersection because the intersection and traffic signal were visible from much farther away than 540 feet. Wyble stated that when one crests the bridge and starts down during the day, he has a bird’s-eye view of the general area. At night, the traffic signal is “very conspicuous” in this dark intersection. Wyble testified the signal is visible over twice the minimum distance away and the signs are adequate.
Steven C. Strength is a district traffic operations engineer for DOTD. He had been to the scene twice before the accident to check on the newly-installed traffic signal. He corroborated Wyble’s testimony that from the bottom of the bridge to the intersection motorists have more than twice as many feet of visibility as the Manual requires. He stated that on his two visits to the scene, he had no difficulty seeing the signal.
Strength stated there were no construction-warning fights at this intersection. The only fights were at least 500 feet away, near the intersection of Prospect and Bayou Blue. On his two visits to the scene before the accident, he had no trouble distinguishing between .the construction fights and the signal fight. He stated DOTD had had no complaints about the construction fights being distracting.

Standard of review

The standard of appellate review of factual findings is a two-part test: 1) the appellate court must find from the record there is a reasonable factual basis for the trial court’s finding, and 2) the appellate court must further determine the record establishes the finding is not clearly wrong (manifestly erroneous).[4] Factual findings should not be reversed on appeal absent manifest error.[5] If the trial court’s findings are reasonable in fight of the record reviewed in its entirety, the court of appeal may not reverse.[6] Consequently, when there are two permissible views of the evidence, |Rthe fact-finder’s choice between them cannot be manifestly erroneous or clearly wrong.[7]

Fault ofT.L. James & Co., Inc.

The trial court found James was 20% at fault in this accident. With no stated reasons by the trial court, we can only conclude that it must have believed Mitchell’s testimony that the construction fights so distracted him that he became oblivious to all else around him. While the construction-warning fights might have been a cause of the accident, cause does not equal fault. There is no evidence that *1242 the lights were improperly placed or violated any regulations; they served their purpose of warning motorists approaching the intersection of Prospect and Bayou Blue of the detour ahead. The lights were not at the intersection where the accident occurred but were 500 to 600 feet east of it.
Many things can distract a motorist.[8] A motorist has a duty, however, to keep his attention focused on the roadway. The mere fact that Mitchell was distracted by the lights cannot serve as a basis for James’s liability.
Plaintiff also asserts as a basis for James’s liability that James failed to post sufficient signs to inform motorists of the purpose of the lights. The evidence, however, shows a plethora of construction-ahead signs were in place on both the right and left sides of the eastbound lanes of Prospect. Plaintiff contends the signs on the right must have been obscured by brush and weeds. But Mitchell testified he never looked to the right or left as he approached the intersection. Thus, no matter how many signs were visible, the failure of Mitchell to look for signs obviates any possible liability of James for improper signage.[9]
Because we can find no reasonable factual basis in the record to support the trial court’s finding that James was at fault, we must conclude that a finding of any fault on James was not a permissible view and constituted manifest error. We hereby 1 nreverse that portion of the judgment assessing fault to James and render judgment dismissing James from both the Clark and Mitchell suits.[10]

Fault of Department of Transportation and Development

The trial court found DOTD 60% at fault in this accident. Once again, with no stated reasons by the trial court, we can only surmise that the trial court believed Mitchell’s testimony that his view of the signal was totally obscured by the trees and plaintiffs testimony that the intersection-warning signs on the right were blocked by brush and weeds.
Was it a permissible view that the trees alongside the road completely blocked Mitchell’s view of the intersection for more than a half mile? On the night of the accident, Mitchell did not know why he had not seen the traffic signal. He did not mention anything to Carpenter, the investigating officer, about his view of the traffic signal and intersection being blocked by trees. After he went to the scene a day or two later and saw the trees had been cut, Mitchell decided the trees must have blocked his vision. He stated the trees were from the top to the bottom of the bridge.- But that does not explain why he did not see the signal in the more than 1,200 feet from the bottom of the bridge to the intersection.
Every witness who was familiar with the way the area looked before the trees were cut stated the trees did not block the signal after the bottom of the bridge. Giovanni testified the signal was clearly visible from the base of the bridge, as did Sheriff Larpenter. Carpenter testified the view of the signal was blocked for an instant as one descended the bridge, but *1243 there were no obstructions of view between the bottom of the bridge and the intersection. Even plaintiff, who testified vision was obscured by the trees as one descended the bridge, admitted that nothing blocked the view of the signal from the bottom of the bridge to the intersection.
Furthermore, Strength and Wyble both testified the distance from the bottom of the bridge to the intersection exceeded 1,000 feet. Wyble actually measured the distance from the base of the bridge to the stop line before the intersection and found it to be 1,212 feet. Wyble testified that if Mitchell had been driving 50 miles per hour, jinhe would have had 16 seconds to see the light from the bottom of the bridge to the intersection.
Based on the evidence in the record, we find no reasonable factual basis for a finding that the trees so obscured the signal that it was impossible for Mitchell to see it in time to avoid the accident. The only other theory of DOTD’s liability is that the signs warning of an intersection ahead were obscured by trees and weeds. This theory does not provide a basis for liability for three reasons.
First, the intersection-ahead signs were not required by the Manual for Uniform Traffic Control Devices because the intersection was visible for much more than 540 feet; the signs were simply lagniappe. Second, because of the complementary-sign system, even if the signs on the right were obscured, the signs on the left were open and obvious. Third, Mitchell never looked to his right or left, so obseurement of the signs could not have been a cause in fact of the accident.
Having found no reasonable factual basis for the trial court’s finding that DOTD was at fault in this accident, we must conclude the trial court was clearly wrong and reverse the judgment against it.
QUANTUM
None of defendants assigned the damage amounts as error. As aforementioned, we have reversed the trial court’s fault allocations, finding no fault on James or DOTD, and we assign 100% fault to Mitchell. Accordingly, we must also amend the judgment in the Clark suit to reflect that Mitchell is now cast for all the Clarks’ damage awards.
CONCLUSION
For the foregoing reasons, the judgment of the trial court in the Mitchell suit is vacated as to Highland Insurance Company and is reversed as to the State of Louisiana, Department of Transportation and Development and T.L. James & Co., Inc. Judgment is hereby rendered dismissing Mitchell’s suit at Mitchell’s cost. In the Clark suit, the judgment of the trial court is vacated as to Highland Insurance Company and is reversed as to T.L. James & Co., Inc., and the State of Louisiana, Department of Transportation and Development. The judgment in that suit is hereby reformed to cast Mitchell with 100% of fault and damages, and judgment is rendered dismissing T. InL. James & Co., Inc., and the State of Louisiana, Department of Transportation and Development. Plaintiff is east for all costs of this appeal.
VACATED IN PART, REVERSED IN PART, AND RENDERED IN PART.

. Plaintiff and Mitchell also sued the Parish of Terrebonne, through the Terrebonne Parish Consolidated Government (TPCG). However, plaintiff voluntarily dismissed TPCG from her suit, and the trial court granted summary judgment dismissing TPCG from Mitchell’s suit.

. See La. C.C.P. art. 2002.

. Stop lines show motorists where to stop at large or complex intersections.

. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987).

. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).

. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990).

. Housley v. Cerise, 579 So.2d 973, 976 (La.1991); Sistler, 558 So.2d at 1112.

.See, e.g., Paul v. Louisiana State Employees Group Benefit Program, 99-0897 (La.App. 1st Cir.5/12/00), 762 So.2d 136 (herd of camels in a pasture); Jackson v. Scott Truck & Tractor, 31,933 (La.App.2d Cir.5/5/99), 736 So.2d 987 (pedestrian on the side of the road waving her arms); Allen v. Roadway Express, 31,628 (La.App.2d Cir.2/24/99), 728 So.2d 1015 (wrecked vehicle and billboard with photograph of teenage accident victim placed on roadside to warn other teenagers).

. Compare Bloxom v. Bloxom, 512 So.2d 839, 850-851 (La.1987) (automobile manufacturer not liable for inadequate warnings in owner's manual because car owner testified he never read the manual).

. James was never named a defendant in the Mitchell suit and that judgment is a nullity. James did not raise the nullity issue on appeal, however.